**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1972**

BMG RIGHTS MANAGEMENT (US) LLC,

        Plaintiff - Appellee,

    and

ROUND HILL MUSIC LP,

        Plaintiff,

        v.

COX COMMUNICATIONS, INCORPORATED; COXCOM, LLC,

        Defendants - Appellants,

    and

COX ENTERPRISES, INC.; COXCOM, INC., d/b/a Cox Communications of Northern Virginia; JOHN DOE 2, IP Subscriber 174.65.175.31,

        Defendants,

RIGHTSCORP, INC.,

        Party-in-Interest.

-------------------------------------------------------

AMERICAN COUNCIL ON EDUCATION; ASSOCIATION OF AMERICAN UNIVERSITIES; EDUCAUSE; AMERICAN LIBRARY ASSOCIATION; ASSOCIATION OF RESEARCH LIBRARIES; ASSOCIATION OF COLLEGE AND RESEARCH LIBRARIES; AMERICAN INDIAN HIGHER EDUCATION CONSORTIUM; APPA: LEADERSHIP IN EDUCATIONAL FACILITIES;

NATIONAL ASSOCIATION OF COLLEGE AND UNIVERSITY BUSINESS OFFICERS; THURGOOD MARSHALL COLLEGE FUND; ASSOCIATION OF CATHOLIC COLLEGES AND UNIVERSITIES; NATIONAL ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES; PUBLIC KNOWLEDGE; ELECTRONIC FRONTIER FOUNDATION; CENTER FOR DEMOCRACY & TECHNOLOGY,

Amici Curiae,

and

CONSUMER TECHNOLOGY ASSOCIATION; COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION; UNITED STATES TELECOM ASSOCIATION; AMERICAN CABLE ASSOCIATION; INTERNET COMMERCE COALITION,

Amici Supporting Appellant,

RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.; THE COPYRIGHT ALLIANCE; NATIONAL MUSIC PUBLISHERS' ASSOCIATION; NASHVILLE SONGWRITERS ASSOCIATION INTERNATIONAL; MOTION PICTURE ASSOCIATION OF AMERICA, INC.,

Amici Supporting Appellee.

─────────────

**No. 17-1352**

─────────────

BMG RIGHTS MANAGEMENT (US) LLC,

Plaintiff - Appellant,

and

ROUND HILL MUSIC LP,

Plaintiff,

v.

COX COMMUNICATIONS, INCORPORATED; COXCOM, LLC,

2

Defendants - Appellees,

and

COX ENTERPRISES, INCORPORATED; COXCOM, INC., d/b/a Cox Communications of Northern Virginia; JOHN DOE, IP Subscriber 174.65.175.31,

Defendants,

RIGHTSCORP, INC.,

Party-in-Interest.

---

**No. 17-1353**

---

BMG RIGHTS MANAGEMENT (US) LLC; ROUND HILL MUSIC LP,

Plaintiffs - Appellees,

v.

COX COMMUNICATIONS, INCORPORATED; COXCOM, LLC,

Defendants - Appellants,

and

COX ENTERPRISES, INCORPORATED; COXCOM, INC., d/b/a Cox Communications of Northern Virginia; JOHN DOE, IP Subscriber 174.65.175.31,

Defendants,

RIGHTSCORP, INC.,

Party-in-Interest.

3

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, District Judge. (1:14-cv-01611-LO-JFA)

Argued: October 25, 2017                              Decided: February 1, 2018

Before MOTZ and WYNN, Circuit Judges, and SHEDD, Senior Circuit Judge.

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Wynn and Senior Judge Shedd joined.

**ARGUED:** Michael S. Elkin, WINSTON & STRAWN LLP, New York, New York, for Appellants/Cross-Appellees. Michael J. Allan, STEPTOE & JOHNSON LLP, Washington, D.C., for Appellee/Cross-Appellant. **ON BRIEF:** Thomas P. Lane, New York, New York, Jennifer A. Golinveaux, Thomas J. Kearney, San Francisco, California, Steffen N. Johnson, Christopher E. Mills, WINSTON & STRAWN LLP, Washington, D.C.; Craig C. Reilly, Alexandria, Virginia, for Appellants/Cross-Appellees. William G. Pecau, John M. Caracappa, Jeffrey M. Theodore, STEPTOE & JOHNSON LLP, Washington, D.C.; Walter D. Kelly, Jr., HAUSFELD, LLP, Washington, D.C., for Appellee/Cross-Appellant. Seth D. Greenstein, CONSTANTINE CANNON LLP, Washington, D.C., for Amici Consumer Technology Association and Computer & Communications Industry Association. Jonathan Band, JONATHAN BAND PLLC, Washington, D.C., for Amici American Council on Education, Association of American Universities, Educause, American Library Association, Association of Research Libraries, Association of College and Research Libraries, American Indian Higher Education Consortium, APPA: Leadership in Educational Facilities, National Association of College and University Business Officers, Thurgood Marshall College Fund, Association of Catholic Colleges and Universities, and National Association of Independent Colleges and Universities. David E. Weslow, Brett A. Shumate, Ari S. Meltzer, WILEY REIN LLP, Washington, D.C., for Amicus United States Telecom Association. Ross J. Lieberman, AMERICAN CABLE ASSOCIATION, Washington, D.C.; John D. Seiver, Ronald G. London, William W. Hellmuth, DAVIS WRIGHT TREMAINE LLP, Washington, D.C., for Amicus American Cable Association. Andrew L. Deutsch, DLA PIPER LLP, New York, New York, for Amicus Internet Commerce Coalition. Mitchell L. Stoltz, ELECTRONIC FRONTIER FOUNDATION, San Francisco, California; Charles Duan, PUBLIC KNOWLEDGE, Washington, D.C., for Amici Public Knowledge, Electronic Frontier Foundation, and Center for Democracy & Technology. George M. Borkowski, RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC., Washington, D.C.;

Kannon K. Shanmugam, Thomas G. Hentoff, Connor S. Sullivan, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Amicus Recording Industry Association of America, Inc. Linda M. Burrow, Eric S. Pettit, Albert Giang, Alison Mackenzie, CALDWELL LESLIE & PROCTOR, PC, Los Angeles, California, for Amicus The Copyright Alliance. Erich C. Carey, Vice President & Senior Counsel, Litigation, NATIONAL MUSIC PUBLISHERS' ASSOCIATION, Washington, D.C., for Amicus National Music Publishers' Association. Jacqueline C. Charlesworth, New York, New York, for Amici National Music Publishers' Association and Nashville Songwriters Association International. R. Reeves Anderson, Denver, Colorado, Elisabeth S. Theodore, Washington, D.C., John C. Ulin, ARNOLD & PORTER KAYE SCHOLER LLP, Los Angeles, California, for Amicus Motion Picture Association of America, Inc.

---

5

DIANA GRIBBON MOTZ, Circuit Judge:

BMG Rights Management (US) LLC ("BMG"), which owns copyrights in musical compositions, filed this suit alleging copyright infringement against Cox Communications, Inc. and CoxCom, LLC (collectively, "Cox"), providers of high-speed Internet access. BMG seeks to hold Cox contributorily liable for infringement of BMG's copyrights by subscribers to Cox's Internet service. Following extensive discovery, the district court held that Cox had not produced evidence that it had implemented a policy entitling it to a statutory safe harbor defense and so granted summary judgment on that issue to BMG. After a two-week trial, a jury found Cox liable for willful contributory infringement and awarded BMG $25 million in statutory damages. Cox appeals, asserting that the district court erred in denying it the safe harbor defense and incorrectly instructed the jury. We hold that Cox is not entitled to the safe harbor defense and affirm the district court's denial of it, but we reverse in part, vacate in part, and remand for a new trial because of certain errors in the jury instructions.

I.

A.

Cox is a conduit Internet service provider ("ISP"), providing approximately 4.5 million subscribers with high-speed Internet access for a monthly fee. Some of Cox's subscribers shared and received copyrighted files, including music files, using a technology known as BitTorrent. BitTorrent is not a software program, but rather describes a protocol — a set of rules governing the communication between computers — that allows individual

6

computers on the Internet to transfer files directly to other computers. This method of file sharing is commonly known as "peer-to-peer" file sharing, and contrasts with the traditional method of downloading a file from a central server using a Web browser.

Although peer-to-peer file sharing is not new, what makes BitTorrent unique is that it allows a user to download a file from multiple peers at the same time — even peers who only have a piece of the file, rather than the complete file. In other words, as soon as a user has downloaded a piece of the file, he or she can begin sharing that piece with others (while continuing to download the rest of the file). This innovation makes sharing via BitTorrent particularly fast and efficient. Although BitTorrent can be used to share any type of digital file, many use it to share copyrighted music and video files without authorization.

As a conduit ISP, Cox only provides Internet access to its subscribers. Cox does not create or sell software that operates using the BitTorrent protocol, store copyright-infringing material on its own computer servers, or control what its subscribers store on their personal computers.

Cox's agreement with its subscribers reserves the right to suspend or terminate subscribers who use Cox's service "to post, copy, transmit, or disseminate any content that infringes the patents, copyrights . . . or proprietary rights of any party." To enforce that agreement and protect itself from liability, however, Cox created only a very limited automated system to process notifications of alleged infringement received from copyright owners. Cox's automated system rests on a thirteen-strike policy that determines the action to be taken based on how many notices Cox has previously received regarding infringement by a particular subscriber. The first notice alleging a subscriber's infringement produces

7

no action from Cox. The second through seventh notices result in warning emails from Cox to the subscriber. After the eighth and ninth notices, Cox limits the subscriber's Internet access to a single webpage that contains a warning, but the subscriber can reactivate complete service by clicking an acknowledgement. After the tenth and eleventh notices, Cox suspends services, requiring the subscriber to call a technician, who, after explaining the reason for suspension and advising removal of infringing content, reactivates service. After the twelfth notice, the subscriber is suspended and directed to a specialized technician, who, after another warning to cease infringing conduct, reactivates service. After the thirteenth notice, the subscriber is again suspended, and, for the first time, considered for termination. Cox never automatically terminates a subscriber.

The effectiveness of Cox's thirteen-strike policy as a deterrent to copyright infringement has several additional limitations. Cox restricts the number of notices it will process from any copyright holder or agent in one day; any notice received after this limit has been met does not count in Cox's graduated response escalation. Cox also counts only one notice per subscriber per day. And Cox resets a subscriber's thirteen-strike counter every six months.

BMG, a music publishing company, owns copyrights in musical compositions. To protect this copyrighted material, BMG hired Rightscorp, Inc., which monitors BitTorrent activity to determine when infringers share its clients' copyrighted works. When Rightscorp identifies such sharing, it emails an infringement notice to the alleged infringer's ISP (here, Cox). The notice contains the name of the copyright owner (here, BMG), the title of the copyrighted work, the alleged infringer's IP address, a time stamp,

8

and a statement under penalty of perjury that Rightscorp is an authorized agent and the notice is accurate.

Rightscorp also asks the ISP to forward the notice to the allegedly infringing subscriber, since only the ISP can match the IP address to the subscriber's identity. For that purpose, the notice contains a settlement offer, allowing the alleged infringer to pay twenty or thirty dollars for a release from liability for the instance of infringement alleged in the notice. Cox has determined to refuse to forward or process notices that contain such settlement language. When Cox began receiving Rightscorp notices in the spring of 2011 (before Rightscorp had signed BMG as a client), Cox notified Rightscorp that it would process the notices only if Rightscorp removed the settlement language. Rightscorp did not do so. Cox never considered removing the settlement language itself or using other means to inform its subscribers of the allegedly infringing activity observed by Rightscorp.

Rightscorp continued to send Cox large numbers of settlement notices. In the fall of 2011, Cox decided to "blacklist" Rightscorp, meaning Cox would delete notices received from Rightscorp without acting on them or even viewing them. BMG hired Rightscorp in December 2011 — *after* Cox blacklisted Rightscorp. Thus, Cox did not ever view a single one of the millions of notices that Rightscorp sent to Cox on BMG's behalf.

B.

On November 26, 2014, BMG initiated this action against Cox. BMG alleged that Cox was vicariously and contributorily liable for acts of copyright infringement by its subscribers.

9

At the conclusion of discovery, the parties filed multi-issue cross-motions for summary judgment, which the district court resolved in a careful written opinion. Among these issues, BMG asserted that Cox had not established a policy entitling it to the safe harbor defense contained in the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(a). To qualify for that safe harbor, an ISP, like Cox, must have "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeat infringers." *Id.* § 512(i)(1)(A). The district court agreed with BMG and held that no reasonable jury could find that Cox implemented a policy that entitled it to that DMCA safe harbor. The court explained that BMG had offered evidence that "Cox knew accounts were being used repeatedly for infringing activity yet failed to terminate" those accounts and that Cox did "not come forward with any evidence" to the contrary. Accordingly, the court granted summary judgment to BMG on Cox's safe harbor defense.

The case proceeded to a jury trial that involved the testimony of more than a dozen witnesses and admission of numerous documents. At the conclusion of the trial, the district court instructed the jury that to prove contributory infringement, BMG had to show "direct infringement of BMG's copyrighted works" by Cox subscribers, that "Cox knew or should have known of such infringing activity," and that "Cox induced, caused, or materially contributed to such infringing activity." The court further instructed the jury that BMG could prove Cox's knowledge of infringing activity by showing willful blindness, if Cox "was aware of a high probability that Cox users were infringing BMG's copyrights but consciously avoided confirming that fact."

10

The jury found Cox liable for willful contributory infringement and awarded BMG $25 million in statutory damages. The jury also found that Cox was not liable for vicarious infringement. The district court denied all post-trial motions and entered judgment in accordance with the verdict. Cox appeals, arguing that BMG should not have been granted summary judgment as to the DMCA safe harbor and that erroneous jury instructions entitle it to a new trial.[1]

## II.

We first address Cox's contention that the district court erred in denying it the § 512(a) DMCA safe harbor defense. We review de novo the grant of summary judgment. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

### A.

The DMCA provides a series of safe harbors that limit the copyright infringement liability of an ISP and related entities. As a conduit ISP, Cox seeks the benefit of the safe harbor contained in 17 U.S.C. § 512(a). To fall within that safe harbor, Cox must show that it meets the threshold requirement, common to all § 512 safe harbors, that it has "adopted and reasonably implemented . . . a policy that provides for the termination in

---

[1] After trial, both parties moved for fees and costs. The district court awarded BMG over $8 million in attorney's fees but limited some of the costs recoverable by BMG. The court denied Cox's motion for fees and costs against an earlier plaintiff in the litigation, Round Hill Music LP, against whom Cox prevailed on summary judgment. The parties appeal these orders. Because our holding as to the jury instructions requires us to vacate this award of fees and costs, we do not address the merits of those awards.

appropriate circumstances of subscribers . . . who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

Cox's principal contention is that "repeat infringers" means *adjudicated* repeat infringers: people who have been held liable by a court for multiple instances of copyright infringement. Cox asserts that it complied with § 512(i)(1)(A)'s requirement and is therefore entitled to the § 512(a) DMCA safe harbor because BMG did not show that Cox failed to terminate any adjudicated infringers. BMG responds that Cox's interpretation of "repeat infringers" is contrary to "the DMCA's plain terms." Appellee Br. at 31.

Because the statute does not define the term "repeat infringers," to resolve that question, we turn first to the term's ordinary meaning. *See Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). The ordinary meaning of an infringer is "[s]omeone who interferes with one of the exclusive rights of a . . . copyright" holder — in short, one who infringes a copyright. *Infringer*, Black's Law Dictionary 902 (10th ed. 2014). A repeat infringer, then, is one who infringes a copyright more than once.

Cox contends that because the repeat infringer provision uses the term "infringer" without modifiers such as "alleged" or "claimed" that appear elsewhere in the DMCA, "infringer" must mean "adjudicated infringer." But the DMCA's use of phrases like "alleged infringer" in other portions of the statute indicates only that the term "infringer" alone must mean something different than "alleged infringer," otherwise, the word "alleged" would be superfluous. Using the ordinary meaning of "infringer," however, fully accords with this principle: someone who *actually* infringes a copyright differs from someone who has merely *allegedly* infringed a copyright, because an allegation could be

12

false. The need to differentiate the terms "infringer" and "alleged infringer" thus does not mandate Cox's proposed definition.

Moreover, other provisions of the Copyright Act use the term "infringer" (and similar terms) to refer to all who engage in infringing activity, not just the narrow subset of those who have been so adjudicated by a court. For example, § 501(a), which creates a civil cause of action for copyright owners, states that "[a]nyone who violates any of the exclusive rights of the copyright owner" provided for in the statute "is an *infringer* of the copyright or right of the author." 17 U.S.C. § 501(a) (emphasis added).

Similarly, the DMCA itself provides that ISPs who store copyrighted material are generally not liable for removing "material or activity *claimed to be infringing or* based on facts or circumstances from which *infringing activity is apparent*, regardless of whether the material or activity is *ultimately determined to be infringing*." *Id.* § 512(g)(1) (emphases added). This provision expressly distinguishes among three categories of activity: activity merely "claimed to be infringing," actual "infringing activity" (as is apparent from "facts or circumstances"), and activity "ultimately determined to be infringing." The distinction between "infringing activity" and activity "ultimately determined to be infringing" in § 512(g) shelters ISPs from being liable for taking down material that *is* "infringing," even if no court "ultimately determine[s]" that it is infringing — because, for example, the copyright holder simply does not file a lawsuit against the person who uploaded the infringing material. As this provision illustrates, Congress knew how to expressly refer to adjudicated infringement, but did not do so in the repeat infringer provision. *See also id.* § 512(b)(2)(E)(i) (addressing circumstance in which "a court has

13

ordered that . . . material be removed"). That suggests the term "infringer" in § 512(i) is not limited to adjudicated infringers.

The legislative history of the repeat infringer provision supports this conclusion. Both the House Commerce and Senate Judiciary Committee Reports explained that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access." H.R. Rep. No. 105-551, pt. 2, at 61 (1998); S. Rep. No. 105-190, at 52 (1998). This passage makes clear that if persons "abuse their access to the Internet through disrespect for the intellectual property rights of others" — that is, if they infringe copyrights — they should face a "realistic threat of losing" their Internet access. The passage does not suggest that they should risk losing Internet access only once they have been sued in court and found liable for multiple instances of infringement. Indeed, the risk of losing one's Internet access would hardly constitute a "realistic threat" capable of deterring infringement if that punishment applied only to those *already* subject to civil penalties and legal fees as adjudicated infringers.

The only circuit to expressly consider the definition of a "repeat infringer" in the DMCA has defined it to mean "someone who interferes with one of the exclusive rights of a copyright" "again or repeatedly." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016) (alterations, internal quotation marks, and citations omitted); *accord, e.g.*, *Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004) (finding material dispute of fact as to whether ISP was entitled to invoke safe harbor provision because there was "ample evidence" that ISP did not terminate "repeat infringers," but not suggesting

14

that the infringing subscribers were *adjudicated* infringers); *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) (finding ISP ineligible for safe harbor defense where ISP "invited" "the use of its service by 'repeat infringers,'" but not discussing any evidence that users were *adjudicated* infringers). Cox does not cite a single case adopting its contrary view that only adjudicated infringers can be "repeat infringers" for purposes of the DMCA.[2]

Accordingly, we reject Cox's argument that the term "repeat infringers" in § 512(i) is limited to adjudicated infringers.[3]

### B.

Section 512(i) thus requires that, to obtain the benefit of the DMCA safe harbor, Cox must have reasonably implemented "a policy that provides for the termination in appropriate circumstances" of its subscribers who repeatedly infringe copyrights. 17 U.S.C. § 512(i)(1)(A). We are mindful of the need to afford ISPs flexibility in crafting repeat infringer policies, and of the difficulty of determining when it is "appropriate" to

---

[2] Nor do we find Cox's reliance on Professor Nimmer's copyright treatise convincing. Although the treatise discusses several possible meanings for the term "infringer," it ultimately concludes that "an 'infringer' in the statutory sense may be *either* a party who has been adjudicated to have committed copyright infringement, *or* a party about whom the service provider has actual knowledge that s/he has engaged in infringement." 4 Nimmer on Copyright § 12B.10[B][3][c] (emphases added); *see id.* § 12B.10[B][3][a]. That conclusion lies at odds with Cox's assertion that only an adjudicated infringer qualifies as an "infringer" for purposes of the DMCA.

[3] We note that even were we to adopt Cox's position that its policy must only target *adjudicated* repeat infringers, Cox undisputedly did not have such a policy. As summarized above, Cox's policy focused on the number of complaints (or strikes) a subscriber received, not whether a court had adjudicated the subscriber a repeat infringer.

15

terminate a person's access to the Internet. *See id.* At a minimum, however, an ISP has not "reasonably implemented" a repeat infringer policy if the ISP fails to enforce the terms of its policy in any meaningful fashion. *See In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 659 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003) ("Adopting a repeat infringer policy and then purposely eviscerating any hope that such a policy could ever be carried out is not an 'implementation' as required by § 512(i)."). Here, Cox formally adopted a repeat infringer "policy," but, both before and after September 2012, made every effort to avoid reasonably implementing that policy. Indeed, in carrying out its thirteen-strike process, Cox very clearly determined *not* to terminate subscribers who in fact repeatedly violated the policy.

The words of Cox's own employees confirm this conclusion. In a 2009 email, Jason Zabek, the executive managing the Abuse Group, a team tasked with addressing subscribers' violations of Cox's policies, explained to his team that "if a customer is terminated for DMCA, you are able to reactivate them," and that "[a]fter you reactivate them the DMCA 'counter' restarts." The email continued, "This is to be an unwritten semi-policy." Zabek also advised a customer service representative asking whether she could reactivate a terminated subscriber that "[i]f it is for DMCA you can go ahead and reactivate." Zabek explained to another representative: "Once the customer has been terminated for DMCA, we have fulfilled the obligation of the DMCA safe harbor and can start over." He elaborated that this would allow Cox to "collect a few extra weeks of payments for their account.  ;-)." Another email summarized Cox's practice more succinctly: "DMCA = reactivate." As a result of this practice, from the beginning of the

16

litigated time period until September 2012, Cox *never* terminated a subscriber for infringement without reactivating them.

Cox nonetheless contends that it lacked "actual knowledge" of its subscribers' infringement and therefore did not have to terminate them. That argument misses the mark. The evidence shows that Cox *always* reactivated subscribers after termination, regardless of its knowledge of the subscriber's infringement. Cox did not, for example, advise employees *not* to reactivate a subscriber if the employees had reliable information regarding the subscriber's repeat infringement. An ISP cannot claim the protections of the DMCA safe harbor provisions merely by terminating customers as a symbolic gesture before indiscriminately reactivating them within a short timeframe.

In September 2012, Cox abandoned its practice of routine reactivation. An internal email advised a new customer service representative that "we now terminate, for real." BMG argues, however, that this was a change in form rather than substance, because instead of terminating and then reactivating subscribers, Cox simply stopped terminating them in the first place. The record evidence supports this view. Before September 2012, Cox was terminating (and reactivating) 15.5 subscribers per month on average; after September 2012, Cox abruptly began terminating *less than one* subscriber per month on average. From September 2012 until the end of October 2014, the month before BMG filed suit, Cox issued only 21 terminations in total. Moreover, at least 17 of those 21 terminations concerned subscribers who had either failed to pay their bills on time or used excessive bandwidth (something that Cox subjected to a strict three-strike termination policy). Cox did not provide evidence that the remaining four terminations were for repeat

17

copyright infringement. But even assuming they were, they stand in stark contrast to the over 500,000 email warnings and temporary suspensions Cox issued to alleged infringers during the same time period.

Moreover, Cox dispensed with terminating subscribers who repeatedly infringed *BMG's* copyrights in particular when it decided to delete automatically all infringement notices received from BMG's agent, Rightscorp. As a result, Cox received none of the millions of infringement notices that Rightscorp sent to Cox on BMG's behalf during the relevant period. Although our inquiry concerns Cox's policy toward all of its repeatedly infringing subscribers, not just those who infringed BMG's copyrights, Cox's decision to categorically disregard all notices from Rightscorp provides further evidence that Cox did not reasonably implement a repeat infringer policy. *See Ellison*, 357 F.3d at 1080 (holding that "the district court erred in concluding on summary judgment that [the ISP] satisfied the requirements of § 512(i)" because the record showed that the ISP "allowed notices of potential copyright infringement to fall into a vacuum and to go unheeded," indicating it "had not reasonably implemented its policy against repeat infringers"); *Aimster*, 334 F.3d at 655 (holding that a defendant who "disabled itself from doing anything to prevent infringement" did not reasonably implement a repeat infringer policy).

BMG also provided evidence of particular instances in which Cox failed to terminate subscribers whom Cox employees regarded as repeat infringers. For example, one subscriber "was advised to stop sharing . . . and remove his PTP programs," and a Cox employee noted that the subscriber was "well aware of his actions" and was "upset that 'after years of doing this' he is now getting caught." Nonetheless, Cox did not terminate

18

the subscriber. Another customer was advised that "further complaints would result in termination" and that it was the customer's "absolute last chance to . . . remove ALL" file-sharing software. But when Cox received another complaint, a manager directed the employee *not* to terminate, but rather to "suspend this Customer, one LAST time," noting that "[t]his customer pays us over $400/month" and that "[e]very terminated Customer becomes lost revenue."

Cox responds that these post-September 2012 emails do not necessarily "*prove* actual knowledge of repeat infringement." Appellants Br. at 59. Again, that argument is misplaced. Cox bears the burden of proof on the DMCA safe harbor defense; thus, Cox had to point to evidence showing that it reasonably implemented a repeat infringer policy. The emails show that Cox internally concluded that a subscriber should be terminated after the next strike, but then declined to do so because it did not want to lose revenue. In other words, Cox failed to follow through on its own policy. Cox argues that these emails only concerned "four cases," and that "occasional lapses" are forgivable. *Id.* at 58. But even four cases are significant when measured against Cox's equally small total number of relevant terminations in this period — also four. More importantly, Cox did not produce any evidence of instances in which it *did* follow through on its policy and terminate subscribers after giving them a final warning to stop infringing.

In addition, Cox suggests that because the DMCA merely requires termination of repeat infringers in "appropriate circumstances," Cox decided not to terminate certain subscribers only when "appropriate circumstances" were lacking. Appellants Br. at 56–57. But Cox failed to provide evidence that a determination of "appropriate circumstances"

19

played *any* role in its decisions to terminate (or not to terminate). Cox did not, for example, point to any criteria that its employees used to determine whether "appropriate circumstances" for termination existed. Instead, the evidence shows that Cox's decisions not to terminate had nothing to do with "appropriate circumstances" but instead were based on one goal: not losing revenue from paying subscribers.

Cox failed to qualify for the DMCA safe harbor because it failed to implement its policy in any consistent or meaningful way — leaving it essentially with no policy. Accordingly, the district court did not err in holding that Cox failed to offer evidence supporting its entitlement to the § 512(a) safe harbor defense and therefore granting summary judgment on this issue to BMG.

III.

We turn to Cox's other principal challenge to the judgment: that the district court erred in instructing the jury as to contributory infringement. "We generally review a trial court's . . . jury instructions for abuse of discretion." *Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005). However, we review de novo whether jury instructions correctly state the law, *see United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003), because a trial court "by definition abuses its discretion when it makes an error of law," *Koon v. United States*, 518 U.S. 81, 100 (1996). Where an instruction is erroneous, we will set aside the verdict if "[t]here is a reasonable probability" that the erroneous instruction "affected the jury's verdict." *See Cherry*, 330 F.3d at 600.

A.

Cox's initial jury instruction argument rests on its contention that it cannot be held liable for contributory copyright infringement because its technology is "capable of substantial noninfringing use." Appellants Br. at 15, 38. According to Cox, the district court erred in refusing "to instruct the jury on this principle." *Id.* at 15.

This argument is meritless. Of course, the mere sale of a product that has both lawful and unlawful uses does not in and of itself establish an intent to infringe. That is the holding of *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). In *Sony*, copyright holders sought to hold Sony contributorily liable for selling video cassette recorders (VCRs) that customers used to tape copyrighted programs. *Id.* at 419–20. The Supreme Court rejected that claim, holding that because a VCR was "capable of commercially significant noninfringing uses," its manufacturer, Sony, could not be held contributory liable for distribution of the VCR. *Id.* at 442.

A few courts initially interpreted *Sony*'s limitation, as Cox does, to mean that if a product can be substantially used lawfully, its producer *cannot* be contributorily liable for copyright infringement. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 380 F.3d 1154, 1162 (9th Cir. 2004), *vacated and remanded*, 545 U.S. 913 (2005); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 262, 267 (5th Cir. 1988). But in *Grokster*, the Supreme Court rejected this broad reading. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005). The Court clarified that "*Sony* barred secondary liability based on *presuming or imputing intent* to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor

21

knows is in fact used for infringement." *Id.* at 933 (emphasis added). The *Grokster* Court explained that under *Sony*, intent to infringe will not be presumed from "the equivocal conduct of selling an item with substantial lawful as well as unlawful uses," even when the seller has the "understanding that some of [his or her] products will be misused." *Id.* at 932–33. More is needed. But the fact that a product is "capable of substantial lawful use" does not mean the "producer can never be held contributorily liable." *Id.* at 934.

Exactly the same flaw infects Cox's related argument that the district court erred in refusing to instruct the jury that "[i]t is not a material contribution to provide a product or service that is capable of substantial non-infringing uses." Appellants Br. 22–23. As the Supreme Court explained, reversal was required in *Grokster* because the Ninth Circuit had "read *Sony*'s limitation to mean that whenever a product is capable of substantial lawful use, the producer can never be held contributorily liable for third parties' infringing use of it . . . . [t]his view of *Sony*, however, was error." *Grokster*, 545 U.S. at 934.

Because the instruction Cox requested misstates the law, the district court did not err in refusing to give it. *See United States v. Smoot*, 690 F.3d 215, 223 (4th Cir. 2012). In fact, providing a product with "substantial non-infringing uses" *can* constitute a material contribution to copyright infringement. *See, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (holding that Google's image search engine "substantially assists websites to distribute their infringing copies" of copyrighted images, and thus constitutes a material contribution, even though "Google's assistance is available to all websites, not just infringing ones"). *Grokster* makes clear that what matters is not simply whether the product has some or even many non-infringing uses, but whether the product

22

is distributed with the *intent* to cause copyright infringement. *See Grokster*, 545 U.S. at 934 ("*Sony*'s rule limits imputing *culpable intent* as a matter of law from the characteristics or uses of a distributed product." (emphasis added)).

Thus, contrary to Cox's argument, the fact that its technology can be substantially employed for a noninfringing use does not immunize it from liability for contributory copyright infringement. The district court did not err in refusing to instruct the jury to the contrary.

B.

Alternatively, Cox offers a more nuanced attack on the contributory infringement instructions. Cox contends that the court erred in charging the jury as to the intent necessary to prove contributory infringement. Specifically, Cox challenges the district court's instructions that the jury could impose liability for contributory infringement if the jury found "Cox knew or should have known of such infringing activity." We agree that in so instructing the jury, the court erred.

i.

*Grokster* teaches that "[o]ne infringes contributorily by *intentionally* inducing or encouraging direct infringement." 545 U.S. at 930 (emphasis added). The requisite intent may, however, be presumed according to the "rules of fault-based liability derived from the common law." *Id.* at 934–35. The most relevant of these common law rules is that if a person "knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *See* Restatement (Second) of Torts § 8A cmt. b (1965); *Grokster*, 545 U.S.

23

at 932 (a person "will be presumed to intend the natural consequences of his acts" (internal quotation marks and citation omitted)).  Under this principle, "when an article is good for nothing else but infringement . . . there is no injustice in presuming or imputing an intent to infringe" based on its sale.  *Grokster*, 545 U.S. at 932 (internal quotation marks and citation omitted).  Assuming the seller is aware of the nature of his product — that its only use is infringing — he knows that infringement is substantially certain to result from his sale of that product and he may therefore be presumed to intend that result.

A similar result follows when a person sells a product that has lawful uses, but with the *knowledge* that the buyer *will in fact* use the product to infringe copyrights.  In that circumstance, the seller knows that infringement is substantially certain to result from the sale; consequently, the seller intends to cause infringement just as much as a seller who provides a product that has exclusively unlawful uses.  *See Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912), *overruled on other grounds*, *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502 (1917).  Indeed, *Henry*, a hundred-year-old Supreme Court case involving contributory patent infringement that the Supreme Court cited in *Grokster*, 545 U.S. at 932–33, 935, and *Sony*, 464 U.S. at 441–42, rests on this very reasoning.  There, the Court affirmed a judgment for contributory infringement based on the defendants' sale to a specific person with knowledge that the product would be used to infringe, even though the product — ink — also had noninfringing uses.  *Henry*, 224 U.S. at 48–49.  The Court reasoned that because the defendants sold the ink "with the expectation that it would be used" to infringe, "the purpose and intent that it would be so used" could be presumed.  *Id.* at 49.

These principles apply equally in cases, like this one, that involve subscription services or rentals rather than one-time sales. Consider a company that leases VCRs, learns that specific customers use their VCRs to infringe, but nonetheless renews the lease to those infringing customers. Given those facts, the company knows that its action — renewing the lease of the VCR to these specific customers — is substantially certain to result in infringement, and so an intent to cause infringement may be presumed. *See Amazon.com*, 508 F.3d at 1172 (explaining that "intent may be imputed" based on "a service provider's knowing failure to prevent infringing actions.")

It is well-established that one mental state slightly less demanding than actual knowledge — willful blindness — can establish the requisite intent for contributory copyright infringement. This is so because the law recognizes willful blindness as *equivalent* to actual knowledge. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) ("[P]ersons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts."); *Aimster*, 334 F.3d at 650 ("Willful blindness is knowledge, in copyright law . . . as it is in the law generally.").

Whether other mental states — such as negligence (where a defendant "should have known" of infringement) — can suffice to prove contributory copyright infringement presents a more difficult question.[4] The notion that contributory liability could be imposed based on something less than actual knowledge, or its equivalent, willful blindness, is not

---

[4] The parties at times refer to this "should have known" standard as a "constructive knowledge" standard. We will follow the Supreme Court and refer to it as a "negligence" standard. *See Global-Tech*, 563 U.S. at 769–71 ("[A] negligent defendant is one who should have known of a . . . risk [of wrongdoing] but, in fact, did not.").

25

entirely without support. *See Aimster*, 334 F.3d at 650 ("[I]n copyright law . . . indeed it may be enough that the defendant *should* have known of the direct infringement . . . .") Nonetheless, we believe for several reasons, that, as Cox contends, negligence does not suffice to prove contributory infringement; rather, at least willful blindness is required.

First, *Grokster*'s recitation of the standard — that "[o]ne infringes contributorily by *intentionally* inducing or encouraging direct infringement" — is on its face difficult to reconcile with a negligence standard. *See* 545 U.S. at 930 (emphasis added). In addition, it would have been unnecessary for the Court to discuss in detail the situations in which intent may be presumed, and those situations, like *Sony*, in which it may not, if liability did not require intent at all, but merely required negligence. *See id.* at 934.

Looking to patent law, as the Supreme Court did in *Sony* and *Grokster*, further counsels against a negligence standard. The Supreme Court has long held that contributory patent infringement requires knowledge of direct infringement. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964). And in 2011, the Court held that willful blindness satisfies this knowledge requirement, but recklessness ("one who merely knows of a substantial and unjustified risk of . . . wrongdoing") and negligence ("one who should have known of a similar risk but, in fact, did not") do not. *Global-Tech*, 563 U.S. at 769–71. The Court reaffirmed this holding in 2015, stating that contributory patent infringement "requires proof the defendant knew the acts were infringing," and that *Global-Tech* "was clear in rejecting any lesser mental state as the standard." *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1928 (2015). The Court expressly rejected the possibility "that a person, or entity, could be liable even though he did not know the acts

26

were infringing." *Id.* Thus, in the patent context, it is clear that contributory infringement cannot be based on a finding that a defendant "should have known" of infringement.

In both *Grokster* and *Sony*, the Supreme Court adopted now-codified patent law doctrines — the staple article doctrine and the inducement rule. The Court did so because of "the historic kinship between patent law and copyright law," *Sony*, 464 U.S. at 439–42, and the similar need in both contexts to impose liability on "culpable expression and conduct" without "discouraging the development of technologies with lawful and unlawful potential," *Grokster*, 545 U.S. at 936–37. We are persuaded that the *Global-Tech* rule developed in the patent law context, which held that contributory liability can be based on willful blindness but not on recklessness or negligence, is a sensible one in the copyright context. It appropriately targets culpable conduct without unduly burdening technological development.[5]

The law of aiding and abetting, "the criminal counterpart to contributory infringement," *Aimster*, 334 F.3d at 651, similarly militates against adoption of a negligence standard. A person "aids and abets a crime when . . . he intends to facilitate that offense's commission." *Rosemond v. United States*, 134 S. Ct. 1240, 1248 (2014).

---

[5] To be sure, in patent law, contributory infringement is codified, and the statute requires that a contributory infringer sell a component "knowing the same to be especially made or especially adapted for use in an infringement." 35 U.S.C. § 271(c). But the Patent Act does not define knowledge or indicate whether knowledge includes willful blindness or something less, like recklessness or negligence. Nor was *Global-Tech*'s holding, that willful blindness suffices but negligence does not, based on statutory interpretation. Thus, *Global-Tech*'s rejection of any mental state lower than willful blindness cannot be limited to patent law solely because contributory infringement is codified in patent law but not in copyright law.

The necessary intent can be presumed only "when a person actively participates in a criminal venture with full *knowledge* of the circumstances constituting the charged offense." *Id.* at 1248–49 (emphasis added).

Furthermore, "[t]he Restatement of Torts, under a concert of action principle, accepts a doctrine with rough similarity to criminal aiding and abetting," and therefore provides another analog to contributory infringement. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994). "An actor is liable for harm resulting to a third person from the tortious conduct of another 'if he *knows* that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other.'" *Id.* (quoting Restatement (Second) of Torts § 876(b) (1977)) (emphasis added). Because the Restatement here uses only the word "knows," where in other places it uses phrases like "knows or should know," it is clear that "knows" here refers to actual knowledge, not any lesser mental state. *Compare* Restatement (Second) of Torts § 876(b) *with* § 336 ("knows or has reason to know") *and* § 366 ("knows or should know"). And the Second Circuit's widely-cited *Gershwin* decision on contributory infringement expressly drew on precisely this "common law doctrine that one who *knowingly* participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor." *Gershwin Publ'g. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (internal quotation marks and citation omitted) (emphasis added).

We therefore hold that proving contributory infringement requires proof of at least willful blindness; negligence is insufficient.

28

ii.

In arguing to the contrary, BMG relies on a pre-*Grokster* decision, *Ellison v. Robertson*, in which the Ninth Circuit stated that some of its precedents had "interpreted the knowledge requirement for contributory copyright infringement to include both those with *actual knowledge* and those who *have reason to know* of direct infringement." 357 F.3d 1072, 1076 (9th Cir. 2004). But the Ninth Circuit has since clarified, consistent with our holding today, that contributory infringement requires "actual knowledge of specific acts of infringement" or "[w]illful blindness of specific facts." *Ludvarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072–73 (9th Cir. 2013) (internal quotation marks and citation omitted).

BMG also argues that "*Sony* itself described a case where the defendant 'knew *or should have known*' of the infringement as a "situation[] in which the imposition of [contributory] liability is manifestly just." Appellee Br. 44–45 (Appellee's alterations) (quoting *Sony*, 464 U.S. at 437–38, 437 n.18). BMG misreads *Sony*. The quoted sentence refers to *vicarious* liability, stating that imposing liability is "manifestly just" where the defendant can "control the use of copyrighted works by others," *Sony*, 464 U.S. at 437–38 — which is an element of vicarious liability, but not of contributory infringement, *see Grokster*, 545 U.S. at 930 n.9.

In a footnote to that sentence, *Sony* cited numerous lower court cases, including one in which the district court held that an infringer's advertising agency and similar defendants could be held contributorily liable if they "knew or should have known that they were dealing in illegal goods." 464 U.S. at 437 n.18 (citing *Screen Gems-Columbia Music, Inc.*

29

*v. Mark-Fi Records, Inc.*, 256 F.Supp. 399 (S.D.N.Y. 1966)). Although that district court used the phrase "knew or should have known," the allegation in that case was that the defendants were dealing with counterfeit musical records priced "so suspiciously below the usual market price" that the defendants must have known or "deliberately closed [their] eyes" to the fact that the records were infringing. *Screen Gems-Columbia Music*, 256 F. Supp. at 404. In such circumstances, liability could be imposed based on a theory of willful blindness, making it unnecessary to permit the imposition of liability based on a lesser negligence standard.

iii.

In sum, the district court erred in charging the jury that Cox could be found liable for contributory infringement if it "knew or should have known of such infringing activity." The formulation "should have known" reflects negligence and is therefore too low a standard. And because there is a reasonable probability that this erroneous instruction affected the jury's verdict, we remand for a new trial. *See United States v. Wilson*, 133 F.3d 251, 265 (4th Cir. 1997) ("[T]he instructions did not adequately impose . . . the burden of proving knowledge . . . . For this reason, a new trial is required.").[6]

---

[6] BMG's suggestion that the jury in the case at hand found willful blindness when it found willfulness is meritless. Under the willfulness instruction given by the court, the jury could find willfulness based on *recklessness*, a lower standard than willful blindness. Accordingly, we cannot conclude that the willfulness instruction provides a basis to hold that the jury found knowledge or willful blindness.

C.

Cox asserts two further errors in the district court's contributory infringement instructions. Although Cox may not have adequately preserved these errors for review, we address them in the interest of judicial economy to ensure the correctness of the contributory infringement instructions on remand. *See Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 198 (6th Cir. 1986) (finding error in jury instructions and remanding for a new trial, explaining that "[a]lthough it appears that defendant may not have adequately preserved [the alleged errors in the jury instructions] for appeal, we nonetheless address them to ensure that the proper instructions are given on remand").

First, Cox contends that the district court erred in instructing the jury that Cox could be held liable for contributory copyright infringement on the basis of proof of "direct infringement of BMG's copyrighted works by users of Cox's Internet services" and that Cox knew "of such activity." *See* Appellants Br. at 24. Cox maintains that such "generalized knowledge — that infringement was occurring somewhere on its network — is exactly what falls short under *Sony*." *Id.* at 27. We must agree.

Selling a product with both lawful and unlawful uses suggests an intent to cause infringement only if the seller knows of *specific* instances of infringement, but not if the seller only *generally* knows of infringement. *See Ludvarts*, 710 F.3d at 1072 (holding that contributory copyright infringement "requires more than a generalized knowledge . . . of the possibility of infringement"; it requires "specific knowledge of infringement"). A seller who only generally knows of infringement is aware that "some of [his] products will be misused" — but critically, not *which* products will be misused. *See Grokster*, 545 U.S. at

31

932–33.  Thus, when that seller makes a sale to a specific customer, the seller knows only that the customer *may* infringe, not that the customer is substantially certain to do so.

BMG does not dispute that the requisite mental state must be tied to specific infringements; it contends, however, that the court's instructions in fact "tied knowledge to specific acts of direct infringement."  Appellee Br. at 50.  BMG rests on the fact that the instruction required that Cox knew "of *such* infringing activity," and that *such* infringing activity referred back to "direct infringement of BMG's copyrighted works by users of Cox's Internet service."

It does not follow, however, that a jury so instructed found that Cox had knowledge of specific infringements.  For example, the jury could have found that Cox knew of "direct infringement of BMG's copyrighted works" by its subscribers if Cox had data showing that *some number of its subscribers* were infringing BMG's copyrights, even if the data did not show *which ones* were infringing.  That level of generalized knowledge does not reflect an intent to cause infringement, because it is not knowledge that infringement is substantially certain to result from Cox's continued provision of Internet access to particular subscribers.  Put another way, the proper standard requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it.  On remand, therefore, the contributory infringement instruction should require that Cox knew of specific instances of infringement or was willfully blind to such instances.

Relatedly, Cox challenges the district court's willful blindness instruction.  The court instructed the jury that Cox "acted with willful blindness if it was aware of a high probability that Cox users were infringing BMG's copyrights but consciously avoided

32

confirming that fact." Since we have held that contributory infringement requires knowledge of, or willful blindness to, *specific instances* of infringement, the court's willful blindness instruction should similarly require a conclusion that Cox consciously avoided learning about specific instances of infringement, not merely that Cox avoided confirming the fact that "Cox users were infringing BMG's copyrights" in general.

## D.

Although we have concluded that the district court incorrectly instructed the jury in some instances, we reject Cox's argument that with proper instructions, it is entitled to judgment as a matter of law. The district court's thoroughness and sure grasp of numerous complex issues provide a model of fair administration of justice. At trial, BMG offered powerful evidence from which a reasonable jury could find that Cox willfully blinded itself to specific instances of infringement by its subscribers, such as evidence that Cox prevented itself from receiving any of the more than one million notices Rightscorp sent on BMG's behalf. Indeed, that appears to be the primary theory for liability advanced by BMG. *See* Appellee Br. at 21 ("Cox was put on notice of — and willfully blinded itself to — millions of specific instances of unlawful sharing of BMG's works by its subscribers . . . ."). That determination, of course, must be made by a jury properly instructed as to the law. But the trial record provides no basis for judgment as a matter of law in Cox's favor.

## IV.

Cox advances several other claims of error. None have merit.

33

A.

Cox challenges the district court's willfulness instruction, arguing that it incorrectly required "the jury to analyze Cox's knowledge of its *subscribers'* actions," rather than Cox's knowledge that "*its actions* constitute an infringement." Appellants Br. at 59.[7] BMG contends that Cox failed to preserve this objection. We need not address whether Cox waived the objection because we reject it on the merits. Cox does not dispute that willfulness in copyright law is satisfied by recklessness, and the case law defines recklessness broadly. For example, we have explained that copyright infringement is willful if the defendant "recklessly disregards a copyright holder's rights." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001). The Second Circuit has similarly held that a finding of willfulness is appropriate if "the defendant's actions were the result of 'reckless disregard' for . . . the copyright holder's rights." *Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005). Contributorily (or vicariously) infringing with knowledge that one's subscribers are infringing is consistent with at least reckless disregard for the copyright holder's rights.

Cox next argues that the court erred by declining to give an innocent infringer instruction. Again, we disagree. Innocent infringer status (which may reduce damages) is only available if the infringer can prove that he or she "had no reason to believe that his or

---

[7] The court's willfulness instruction reads in full:

Cox's contributory or vicarious infringement is considered willful if BMG proves by a preponderance of the evidence that Cox had knowledge that its subscribers' actions constituted infringement of BMG's copyrights, acted with reckless disregard for the infringement of BMG's copyrights, or was willfully blind to the infringement of BMG's copyrights."

34

her acts constituted an infringement." 17 U.S.C. § 504(c)(2). For example, the Second Circuit upheld a district court's conclusion as to innocent infringement where an infringing music wholesaler reasonably believed that it had received the right to make copies of copyrighted albums under an agreement with the copyright holder. *See Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010). Cox does not suggest such circumstances were present here. The district court therefore correctly concluded that an innocent infringer instruction was not available to Cox.

Cox also challenges the district court's DMCA instruction. At trial, witnesses and documents often referred to the DMCA and its safe harbor provisions. Because the court held Cox not entitled to any DMCA safe harbor defense at summary judgment, it instructed the jury that "the DMCA is not a defense in this case and must be disregarded." Cox fails to show that this instruction — which is not a misstatement of the law — constitutes an abuse of discretion. Cox's theory is that the instruction "suggested that Cox's alleged failure to qualify for the DMCA defense made it liable for infringement." Appellants Br. at 33. But the district court clearly instructed the jury that it alone would determine the facts and weigh the evidence. And indeed, the jury found Cox not liable for vicarious infringement, suggesting it was not so easily confused.

B.

We also reject Cox's assertions that the district court erred in its evidentiary rulings, which we review for abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997).

Cox unpersuasively argues that the court abused its discretion by admitting Rightscorp's notices because the notices were hearsay. The district court correctly concluded that the information contained in the notices was not hearsay because it was generated by a computer and thus was not a "statement." *See United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007) ("Only a person may be a declarant and make a statement. Accordingly, 'nothing "said" by a machine is hear-say'" (*quoting* 4 Mueller & Kirkpatrick, Federal Evidence, § 380, at 65 (2d ed. 1994))). Contrary to Cox's argument, the fact that the machine-generated notices also contained the signature of Rightscorp's CEO and an oath under penalty of perjury does not transform them into statements, since the information itself was not prepared or created by a human.

Nor were the notices excludable as more prejudicial than probative under Federal Rule of Evidence 403. The notices were certainly probative, and although they disfavored Cox's position, Cox fails to demonstrate that they were "*unfairly* prejudicial." *See PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 124 (4th Cir. 2011). "The 'mere fact that the evidence will damage the defendant's case is not enough'" to establish unfair prejudice. *Id.* (quoting *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)).

Cox next faults the district court for admitting two studies examining how much of the content shared using BitTorrent is infringing. Cox argues that the court erred by admitting these studies under Federal Rule of Evidence 803(17), the hearsay exception for "compilations that are generally relied on . . . by persons in particular occupations." Given that BMG's expert, Dr. William Lehr, testified that the two studies "were widely cited in

36

the industry" and were "the most substantial published publicly available studies" on the issue, the court did not abuse its discretion.

Finally, Cox contends that the district court erroneously "allowed BMG's witnesses and attorneys to use the term 'infringement' pervasively when referring to Rightscorp's automated observations." Appellants Br. at 32. But as we have explained above, the court clearly and carefully instructed the jurors that they alone could determine infringement. The court even interrupted BMG's expert testimony to instruct the jury that BMG's expert was using the word infringement to describe "the contents in the notices," but that the jury would "be making the ultimate decision" on infringement. Accordingly, the court did not abuse its discretion.

## V.

For the reasons stated above, we affirm the district court's grant of summary judgment to BMG on the § 512(a) DMCA safe harbor defense, but reverse and remand for a new trial. We also vacate the district court's grant of attorney's fees and costs to BMG and its denial of fees and costs to Cox.

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*